# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JEROME THOMAS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 11 C 4268 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| SHERWIN MILES, Acting Warden, | ) | |
| Stateville Correctional Center,[1] | ) | |
| | ) | |
| Respondent. | ) | |

## OPINION AND ORDER

Petitioner Jerome Thomas, who is currently incarcerated at Stateville Correctional Center, is serving a life sentence for two counts of first degree murder and a thirty-year concurrent sentence for one count of home invasion. Thomas has petitioned this Court for a writ of habeas corpus under 28 U.S.C. § 2254. Thomas raises three grounds of ineffective assistance of trial counsel for (1) failing to move to reconsider a motion to suppress lineup identifications, (2) failing to call Larry Johnson as a witness, and (3) failing to investigate Detective Cassidy's alleged history of investigative misconduct. Thomas also claims that the state court erred in excluding his proposed expert testimony regarding the reliability of eyewitness identification. Because Thomas has not shown that the Illinois Appellate Court's decisions on his ineffective assistance claims were contrary to or involved an unreasonable application of clearly established Supreme Court precedent, and his expert testimony claim is procedurally defaulted or alternatively not cognizable on federal habeas review, the Court denies Thomas' petition for a writ of habeas corpus.

---

[1] Sherwin Miles is presently the acting warden at Stateville Correctional Center and is substituted as the Respondent in this matter. *See* Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts.

**BACKGROUND**

The following facts are drawn from the state appellate court opinions on direct and post-conviction review, supplemented by the state trial court record as necessary. The Court will presume that the state court's factual determinations are correct for the purposes of habeas review because Thomas has not pointed to clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Thompkins v. Pfister*, 698 F.3d 976, 983 (7th Cir. 2012). The Court thus adopts the state court's recitation of the facts and begins by summarizing the facts relevant to the petition.

**I.      Thomas' Trial**

At approximately 11 p.m. on Christmas Eve 1995, three armed men entered Leon and Lucille Fields' home in the 1500 block of West 61st Street in the Englewood neighborhood of Chicago, Illinois. The intruders' apparent motive was to enter the Fields' son Dexter's room and steal drugs believed to be there. Dexter was not at home at the time. But Angela Fields, Kenneth Fields, Larry Fields, Larry Johnson, Loreen Monique Phillips, Auvion Strong, Latanya Wallace, and Victor Wallace were gathered together with Leon and Lucille at their house to celebrate Christmas. The intruders shot and murdered Leon and his nephew Victor during the course of the home invasion.

At trial, Angela testified that she lived in her parents' basement with her two children, Larry Fields and Loreen Monique Phillips. Along with her two children and her nephew Auvion, she went to bed in the basement around 10:30 p.m. or 11:00 p.m. on Christmas Eve. Larry was nine, Auvion was seven, and Loreen was three or four years old at the time. Angela told the children to go to sleep and that they would wake up to open their gifts at midnight on Christmas Day. The lights were turned down with only a night light and a light dimmer on a

lamp illuminating the basement. While lying in bed, however, Angela noticed light coming from a flashlight as the intruders entered the basement. She testified that the first assailant wore an orange-beige jumpsuit and had a skullcap covering his forehead. He grabbed Angela by her hair and attempted to take her up the stairs to the home's first floor. Hearing the commotion in the basement, Leon came down the basement stairs with a gun. Leon attempted to shoot the person holding his daughter but his gun jammed. The assailant shot Leon in the side and then chased after him up the stairs.

Angela then tried to run out of the basement but was stopped by one of the other intruders, whom she identified as Thomas at trial. She testified that Thomas was wearing a jumpsuit identical to that of the first intruder, was carrying a flashlight, and had an ear device that appeared to be attached to a phone or a walkie-talkie. Angela further testified that Thomas said, "Bitch, put your hands up in the air before I kill you." *People v. Thomas*, 881 N.E.2d 541, 543, 377 Ill. App. 3d 950, 317 Ill. Dec. 373 (2007). He identified himself as a police officer and then forced her up the stairs. He took her into Dexter's room and placed her on the bed. She recalled Thomas rifling through the room's closet for several minutes, while she watched him. Thomas then threatened to kill Angela if she did not put her face "to the bed." *Id*. He also struck her with a flashlight, demanding to know where the "keys" (which Angela took to mean drugs) were located. *Id*.

Subsequently, Thomas left the room and a third man entered who continued to search the room. Thomas later reentered the room and again asked where "it" was. *Id*. Angela suggested that Thomas look under the bed, after which she got off the bed and looked at Thomas face-to-face. Thomas ordered her to lie on the floor, threatening to kill her if she kept looking at him. Angela testified that she also heard people asking about Dexter in the hallway, with her cousin

Victor saying to leave them alone and "go on 57th and find Dexter." *Id*. She then heard a gunshot and the intruders fleeing, with one of them asking why the other shot the boy. Angela found Victor shot on the hallway floor. She ran across the street to her uncle's home and called the police.

A few weeks later, Angela, her mother Lucille, and several other family members were watching the news on television when Angela recognized Thomas and the other home invaders in police custody for an unrelated case. Angela and her mother contacted the police and went to the police station on February 8, 1996 to view a lineup. Angela first looked at a photo array, but she testified that the photographs showed the men when they were younger and so asked to see them in person. At that point, she identified Thomas and an unspecified number of the other offenders in the lineup. Angela also identified Thomas during her in-court testimony at Thomas' trial.

Larry Fields, who was nine years old at the time of the incident and eighteen at the time of trial, also testified at Thomas' trial. Larry testified that he woke up in the basement, found his mother was not there, and woke up his cousin Auvion. They walked upstairs to investigate, where they found Leon lying on the floor and Victor sitting in the bathroom doorway. One of the intruders claimed to be a police officer and told the boys to lie on the floor.

Larry made an in-court identification of Thomas. He explained that Thomas stepped over him when he was on the floor and shot Victor. Larry testified that Thomas was wearing a brown or beige jumpsuit. Although Larry said Thomas had a scarf covering his eyes and mouth with a hat pulled down, he was able to see Thomas' face because the scarf had fallen down. Larry further explained that he was approximately three feet from Thomas and that there was sufficient light coming from the bathroom, allowing Larry to "get a good look" at Thomas' face. *Id.* at

544. Larry also identified Thomas as the man who killed Victor during the February 8, 1996 lineup.

Lucille testified that she awoke to the sound of gunshots. She ran into the hallway where she saw Leon lying on the floor. A man with a gun confronted her and told her to lie on the floor. She could hear someone saying "bitch" and asking where the "keys" were located. She also heard Victor pleading with the men and then a gunshot. She lay on the floor until one of her children shook her, and then she fled out of the house in a panic. Lucille did not identify any of the intruders at either the lineup or in court.

Latanya was seventeen years old when the home invasion occurred. She testified that she was sleeping in a back bedroom of the house with her cousin Kenneth when she heard arguing and two gunshots. Someone knocked on the door, Kenneth asked who it was, and he received no response. Kenneth asked again, but this time a shot was fired and someone kicked the door open. Latanya testified that someone with a flashlight escorted them into the kitchen, where she saw two intruders, one in a dark jumpsuit, and the other in a lighter one. Both had guns and one had an earpiece. Latanya testified that someone ordered her to lie down in an area close to bathroom, from where she repeatedly heard the men ask where the "keys" were. *Id*. at 545. One of the men said, "Someone going to die tonight, ya going to have a fucked up Christmas." *Id*. She also heard one of the men tell her brother, Victor, "Man, it look like you know something." *Id*. But Latanya testified that Victor told the intruders that he knew nothing and that he did not even live in the house.

In court, Latanya identified Thomas as the man in the lighter jumpsuit with an earpiece. Latanya also saw the intruders on the television news and identified Thomas at the February 8, 1996 lineup. Latanya testified that she would never forget Thomas' face and that she also

identified him by his voice during the lineup, when each man repeated, "I'm going to kill you, bitch, where the keys, I'm going to kill you bitch." *Id.* Latanya conceded on cross-examination that the men had been wearing masks, but she later clarified that the masks had been rolled up on top of their heads so that she could see their faces.

Kenneth was fifteen years old at the time of the incident and testified consistently with Latanya. Kenneth testified that an intruder hit him in the head with a gun because he did not know where the "keys and the Gs" were. *Id.* He identified Thomas, who was wearing a goldish brown jumpsuit, with nothing covering his face but a knit skullcap, as the person who hit him. Kenneth also testified that he had previously seen Thomas in his neighborhood. Kenneth also saw Thomas on the news and identified Thomas in the lineup. Kenneth did admit that the police had told him they thought the people from the house were in the lineup, that he was not the first family member to complete the lineup, and that when family members returned to the waiting room, they discussed who they identified. But he stated that the family members did not describe the place in the lineup of any of the offenders.

Thomas impeached the witnesses with stipulated testimony from various Chicago police officers and detectives. The parties stipulated that police officers questioned Angela, Lucille, Latanya, Kenneth, and Larry at the scene and the family members described all three offenders as five feet, ten inches tall and weighing 145 to 150 pounds each. The presentence investigation report describes Thomas as six feet two inches tall and 210 pounds at the time of trial. The family members also told police at the scene that two of the offenders wore dark clothes but their in-court testimony was that Thomas was in a brown or beige jumpsuit.

Thomas presented a defense at trial. His sister, Tiffany Thomas, and his mother, Deborah McKenzie, both testified that they and several family members left his mother's home at 60th

Street and Hermitage Avenue in Chicago to go shopping at Gurnee Mills, in Gurnee, Illinois around 2 p.m. on Christmas Eve.[2] Thomas was in his mother's home when they left and was there when they returned around 10:30 or 10:45 p.m. that night. Thomas' mother testified she began cooking around 11:30 p.m., and she recalled Thomas coming into the kitchen for a taste of what she was making sometime between 11 p.m. and midnight. Thomas' sister went to bed at 1 a.m., and his mother went to bed around 2 or 2:30 a.m. Both testified that Thomas was still in the home when they went to bed.

Thomas testified in his own defense. He explained that he arrived at his mother's home around 7 or 8 p.m. on Christmas Eve. He watched television and listened to the radio at the house. Thomas did concede, however, that the crime scene was less than a mile from his mother's home and that he had been to the Fields' house two or three times before the home invasion occurred. Thomas testified that he had been friends with Dexter since high school, had met Angela once, and had seen Kenneth at the Fields' house once.[3] Thomas described Dexter as a "big time drug dealer." *Id.* at 547. He testified that he once bought drugs in Dexter's room and another time in front of the Fields' home. He also admitted he gave Dexter $1,500 to buy a car once.

Thomas denied committing the crimes charged in this case but admitted that he had committed eight other robberies and home invasions between August 1995 and January 1996 with Donald McCoy and Robert Walker. McCoy was a Chicago Police Officer who directed

---

[2] According to Google Maps, Thomas' mother's home at 60th and Hermitage is approximately a half mile from Fields' home in the 1500 block of West 61st Street. Gurnee Mills is approximately 55 miles by car from Thomas' mother's home. The Court may take judicial notice of distance based on Google Maps as it is a "'source whose accuracy cannot reasonably be questioned, at least for the purpose of determining' general distances." *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1177 n.3 (7th Cir. 2013) (quoting *United States v. Perea-Rey*, 680 F.3d 1179, 1182 n.1 (9th Cir. 2012)).

[3] Angela testified in rebuttal that she never met Thomas but admitted that Dexter was a drug dealer.

Thomas and Walker to specific homes based on information he received as a police officer. They would commit the crimes in the mornings posing as Cook County Sheriff's Deputies asserting they had search warrants to gain entry to the homes. The other home invasions involved limited violence and Thomas never shot or seriously injured anyone during those crimes. Thomas testified that the men did not wear masks or hoods, that he wore black jeans, and that McCoy would wear a beige coat or tan jumpsuit. Thomas denied having a radio, but he testified that McCoy owned a scanner and knew how to operate it.

After a bench trial, the state trial court judge found Thomas guilty of two counts of first degree murder and one count of home invasion. Thomas received a sentence of life in prison on the first degree murder counts concurrent with a thirty-year prison term on the home invasion count.

## II.    Direct Appeal

Thomas appealed his conviction to the state appellate court. On appeal, Thomas raised four issues: (1) his trial counsel was ineffective for eliciting Thomas' testimony concerning the details of the previous home invasions Thomas and others committed; (2) the trial court abused its discretion by barring expert testimony on the reliability of eyewitness identifications; (3) the trial court should have recused itself from Thomas' motion for a new trial because the judge was a friend of defense counsel and Thomas' motion was based in part on ineffective assistance of counsel; and (4) the trial court erred by taking judicial notice of the time it would have taken Thomas' mother to cook a particular meal, thereby improperly undermining Thomas' mother's alibi testimony. On December 19, 2007, the appellate court found no reversible error and affirmed Thomas' conviction and sentence.

Thomas filed a petition for leave to appeal ("PLA") with the Illinois Supreme Court, arguing that the trial court abused its discretion by barring expert testimony on the reliability of eyewitness identification and that the trial judge should have recused herself from deciding Thomas' motion for a new trial. The Illinois Supreme Court denied Thomas' PLA on March 26, 2008. Thomas did not file a petition for a writ of certiorari with the United States Supreme Court.

### III.      State Post-Conviction Proceedings

Thomas filed a timely *pro se* post-conviction petition pursuant to 725 Ill. Comp. Stat. § 5/122-1 on December 15, 2008. Thomas raised five claims: (1) the State failed to disclose *Brady* material regarding several police officers' alleged history of investigative misconduct, (2) the State knowingly used perjured testimony during the hearing on Thomas' motion for a new trial, (3) post-trial counsel was ineffective for failing to argue various grounds of trial counsel's ineffectiveness, (4) post-trial counsel was ineffective for failing to take several actions during post-trial proceedings, and (5) appellate counsel on direct appeal was ineffective for failing to raise post-trial counsel's ineffectiveness. On March 19, 2009, the trial court dismissed Thomas' petition for post-conviction relief, finding that "the issues raised and presented by petitioner are frivolous and patently without merit." Doc. 21-8 at 20.

Thomas appealed, arguing that trial counsel was ineffective for not discovering Detective Cassidy's history of coercing minors in his investigations and for not calling Larry Johnson as a witness,[4] and that post-trial counsel and appellate counsel on direct appeal were ineffective for not attempting to reopen Thomas' motion to suppress the identification testimony. The appellate court affirmed the dismissal of Thomas' post-conviction petition on February 22, 2011.

---

[4] Larry Johnson was present in the Fields' home at the time of the home invasion and had identified two individuals in a lineup as offenders but had not identified Thomas.

Thomas next filed a PLA with the Illinois Supreme Court, arguing that (1) post-trial counsel was ineffective for failing to file a motion to reconsider the trial court's denial of his motion to suppress the identification testimony, (2) trial counsel was ineffective for failing to call Larry Johnson as a witness, (3) trial counsel was ineffective for not discovering Detective Cassidy's history of investigative misconduct, (4) the State knowingly used perjured testimony during Thomas' hearing on a motion for a new trial, and (5) post-trial and appellate counsel on direct appeal were ineffective for failing to raise trial counsel's ineffectiveness. The Illinois Supreme Court denied the PLA on May 25, 2011. Thomas did not file a petition for writ of certiorari with the United States Supreme Court.

On August 22, 2011, Thomas filed a motion for leave to file a successive post-conviction petition, arguing that the State knowingly used perjured testimony during a grand jury proceeding. The trial court denied the motion. Thomas appealed the denial, and the appellate court affirmed the denial of the motion on December 17, 2012.

## LEGAL STANDARD

A habeas petitioner is entitled to a writ of habeas corpus if the challenged state court decision is either "contrary to" or "an unreasonable application of" clearly established federal law as determined by the United States Supreme Court or if the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 404–05, 120 S. Ct. 1495, 146 L. Ed. 2d 389

(2000). An "unreasonable application" of federal law occurs if the state court correctly identified the legal rule but unreasonably applied the controlling law to the facts of the case. *See id.* at 407. Whether a state court's application of Supreme Court precedent is unreasonable is judged by an objective standard. *Id.* at 409; *Winston v. Boatwright*, 649 F.3d 618, 624 (7th Cir. 2011).

## ANALYSIS

Thomas has asserted four grounds for relief: (1) trial and post-trial counsel were ineffective for failing to move to reconsider Thomas' motion to suppress the lineup identification, (2) trial counsel was ineffective for failing to call Larry Johnson as a witness, (3) trial counsel was ineffective for failing to investigate Detective Cassidy's alleged history of misconduct regarding the coercion of false confessions from children, and (4) the trial court erred in excluding Thomas' proposed expert testimony regarding the reliability of eyewitness identification. The Court addresses each of these claims in turn.

## I. Ineffective Assistance of Counsel

In order to establish constitutionally ineffective assistance of counsel, Thomas must show (1) "that counsel's representation fell below an objective standard of reasonableness" and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In considering the first prong, the Court indulges "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and may not let hindsight interfere with its review of counsel's decisions. *Id.* at 689. As for prejudice, a "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The Court need not address both prongs of the *Strickland* test if one

provides the answer; that is, if the Court determines that the alleged deficiency did not prejudice Thomas, it need not consider the first prong. *Ruhl v. Hardy*, 743 F.3d 1083, 1092 (7th Cir. 2014).

On habeas review, the Court does not evaluate trial counsel's performance *de novo*; rather, it determines whether the state court's application of *Strickland* was unreasonable. *Harrington v. Richter*, 562 U.S. 86, 101, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011); *see also Cullen v. Pinholster*, 563 U.S. 170, 190, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011) (review of ineffective assistance claim is "doubly deferential"). The Court must give "deference and latitude" to the state court's decision. *Harrington*, 562 U.S. at 101. "The bar for establishing that a state court's application of the *Strickland* standard was 'unreasonable' is a high one, and only a clear error in applying *Strickland* will support a writ of habeas corpus." *Allen v. Chandler*, 555 F.3d 596, 600 (7th Cir. 2009).

### A.    Failure to Bring a Renewed Post-Trial Motion to Suppress the Lineup Identification

Thomas argues that counsel was ineffective for failing to bring a renewed motion to suppress the lineup identifications based on information revealed by Kenneth's trial testimony.[5] Thomas' attorney filed a pre-trial motion to suppress the lineup identifications and prohibit in-court identifications to the extent that the identifications were tainted by the lineup. Specifically, that pre-trial motion argued that the lineup procedures were tainted because (1) there was insufficient similarity between Thomas and the other lineup participants so that the lineup impermissibly suggested Thomas as the offender, (2) the police and bystanders improperly suggested to the witnesses that Thomas was the perpetrator of the offense, (3) the witnesses were

---

[5] Thomas' petition states he is challenging trial counsel's failure to file this motion. But he has preserved only a claim that his post-trial counsel failed to renew the motion to suppress. The Court will thus treat Thomas' claim as one for post-trial counsel's ineffectiveness.

improperly allowed to interact and discuss their identifications with each other, and (4) the witnesses were not of a sufficient emotional and physical state to make a proper identification.

The trial court held a hearing on the pre-trial motion to suppress during which it heard testimony from Chicago Police Detectives Cassidy and Foley. Cassidy and Foley, along with two or three other detectives, administered the challenged lineup on February 8, 1996. They testified that Angela, Latanya, Kenneth, Larry, Lucille, and Auvion came to the Chicago Police Department Area One Violent Crimes office at 51st and Wentworth for the lineup. Dexter was also at the police station. Thomas, along with his fellow suspects, McCoy and Walker, were brought from the Cook County Jail for the lineup. Cassidy and Foley testified they were in the room where the witness could see the lineup, while the other detectives were in the room with the individuals in the lineup. Cassidy testified that the witnesses came into the viewing room one by one to look at the lineup. He denied pointing to anyone in the lineup or saying anything suggestive when a witness was viewing the lineup. Cassidy also testified that after each person witnessed the lineup, he or she was taken to another part of the police station to be "sequestered" from those witnesses who had not yet viewed the lineup. Foley also denied pointing out anyone in the line.

When the witnesses entered the viewing room, they saw the seven men in the lineup in a separate room. The men were sitting when the witness first saw them. Then each man was brought up separately to the viewing window so the witness could view him. The individual in the lineup was told to look straight, look right, look left, turn around, turn around again, and then look into the glass again. The men also uttered three phrases, which were something to the effect of "where are the keys," "where is the money," and "we are going to kill you, bitch." Doc. 21-25

at 114.  Once one member of the lineup was finished, he would sit down and another would repeat the same process.  Cassidy did concede that there was a disparity in the height and weight of the men in the lineup.  He explained that having the men sit together helped limit the disparity.

Defense counsel also introduced a picture of the lineup at the hearing.[6]  Defense counsel argued that Thomas was "sticking out like a sore thumb."  *Id*. at 134.  Counsel also argued that Thomas was wearing his Jail pants, and although they were turned inside out, a "D" and "O" could still be viewed so as to suggest that he was currently in prison.  Counsel further argued that the composition was not fair because Thomas was the only person in the lineup who appeared to be tall, heavy, and extremely muscular.

The trial court denied Thomas' pre-trial motion to suppress.  The court ruled that there was nothing in the lineup conducive to irreparable misidentification or suggestive identification.  Regarding the lineup's composition, the trial court explained that it is very difficult to find other people identical to Thomas, as he is a "well-built man" who "looks like he lifted trucks."  *Id*. at 136.  The court went on to explain that three people in the lineup picture looked to be the same height as Thomas, and one man actually looked taller.  Furthermore, the court found the fact that the men were sitting helped to dissipate any disparities.  The court also believed that the fact that the men walked up to the window one at a time eliminated any issue because the witness would have a very hard time comparing relative heights when seeing each person one by one when standing.  The court acknowledged that Thomas was wearing different pants that could have a D or O on them, but it did not make much of that fact.  The court also noted that all the men appeared to be of similar ages and had similar facial hair.  Considering the totality of the circumstances, the trial court concluded that the lineup was fair and denied Thomas' motion.

---

[6] The lineup picture is not included in the state court record before this Court.

At trial, defense counsel[7] argued that the lineup identifications were suggestive as grounds for a not guilty verdict. Again, counsel argued that Thomas was wearing pants that identified him as a prison inmate, that Thomas looked different from the other offenders in the lineup, and that the witnesses spoke to each other after they viewed the lineup. The trial judge, who had also denied Thomas' motion to suppress, again rejected these arguments when she found Thomas guilty.

The trial did disclose new information regarding the lineup, however. On cross-examination, Kenneth testified that the officers told the witnesses that they believed they had caught the assailants and that police wanted the witnesses to pick them out of the lineup. Kenneth also testified on cross-examination that the witnesses went back to the same room where they came from before the lineup. This contradicted the detectives' testimony that the officers sequestered the witnesses after viewing the lineup. According to Kenneth, the witnesses talked to each other after viewing the lineup to make comparisons to see if they picked the same or different people in the lineup. Kenneth testified that he was present for conversations among witnesses who saw the lineup before he viewed the lineup. He admitted, however, that no one came back and told him something specific such as "second from the left or the third." Doc. 22-1 at 37. On redirect, Kenneth clarified that neither his family members, the detectives, nor anyone else suggested who he should pick from the lineup, and that he did not make a suggestion to any other witness.

Thomas' trial and post-trial counsel filed motions for new trial that raised, among other grounds, that the trial court erred in denying the pre-trial motion to suppress the lineup

---

[7] A private attorney represented Thomas at trial. A public defender represented Thomas for the pre-trial suppression hearing and in post-trial proceedings.

identification testimony.[8]  Thomas did not pursue the issue further on direct appeal but was

raised it again in his *pro se* post-conviction petition and a concurrently submitted *pro se* motion

to reconsider the motion to suppress.  The trial court denied Thomas's post-conviction petition.

In affirming the denial, the state appellate court, the last court to rule on the issue, recognized

that the "established two-prong test of *Strickland*" governed Thomas' ineffective assistance of

counsel arguments.  Doc. 21-12 at 10.

The appellate court went on to address Thomas' argument as follows:[9]

> The record discloses that [Thomas] filed a pre-trial motion
> in May 2002 to suppress his lineup identification in which he
> claimed that the lineup was unduly suggestive.  The trial court
> denied the motion.  On December 31, 2008, after his conviction
> and sentencing, [Thomas] filed a *pro se* "Motion to Reconsider the
> Petitioner['s] Motion to Suppress Identification."  The trial court
> denied this motion on March 19, 2009, at the same time it denied
> [Thomas'] postconviction petition which is the subject of this
> appeal.  In denying the motion to reconsider the motion to
> suppress, the trial court noted that [Thomas] had not introduced
> any new evidence that would change the trial court's initial pre-
> trial decision.  In his post-trial motion to reconsider the
> suppression of the identification, [Thomas] repeated his argument
> that the lineup was suggestive, based on the following factors:  he
> was wearing his jail uniform, the other lineup participants were not
> the same height and weight as he was, and Detective Cassidy did
> not deny pointing at [Thomas] during the lineup process.
>
> At trial, the eyewitness Kenneth Fields testified that he had
> identified [Thomas] during the lineup, that he had known

---

[8] After the guilty verdict, Thomas filed a *pro se* motion for a new trial that raised, among other grounds, various claims of ineffective assistance of counsel against his privately retained attorney.  The trial court then appointed new counsel for Thomas, which resulted in the filing of two counseled motions for new trial.  Thomas, however, did not raise an argument of ineffective assistance of counsel regarding the failure to reopen the suppression issue based on Kenneth Fields' trial testimony in his *pro se* motion for new trial.

[9] In the state court, Thomas argued both that his trial counsel was ineffective for failing to renew the motion to suppress and also that his appellate counsel was ineffective for failing to raise the issue on appeal.  However, in this Court, his habeas petition only challenges trial counsel's performance on this issue and omits the appellate counsel argument.  Thus, this Court will only discuss the issue as it relates to Thomas' post-trial counsel.

[Thomas] prior to the time at which the crimes were committed and he also saw [Thomas] on the television news after the crimes had been committed but prior to trial.  Parts of Fields' testimony at trial was that the police officers told him before the lineup that they thought they had the offenders.  Fields also testified that the people who had already seen the lineup were returned to the same waiting room where they discussed their identifications.

On appeal, [Thomas] claims that his post-trial counsel should have requested that the trial court reconsider his motion to suppress the lineup identification based upon this testimony. . . . [Thomas] argues that his identification would have been suppressed as unduly suggestive and the outcome of his trial would have been different.

Our review of the trial testimony leads us to the conclusion that there was nothing stated by Fields to suggest that the witnesses who viewed the lineup were persuaded by the police to cho[o]se [Thomas].  While it may have been better to keep the witnesses separated based on when they viewed the lineup, the fact that the witnesses who already viewed the lineup were in the same room with Fields before he made an identification of [Thomas] from the lineup does not necessarily make the lineup suggestive.  Furthermore, we are unpersuaded that the detective's statement to the effect that the police thought they had apprehended the offender is in and of itself, a taint.  It is commonly understood that when the police conduct a lineup it is because they think they have the perpetrators of the crime or it would be unnecessary to conduct the lineup.

Doc. 21-12 at 10–12.

Applying the AEDPA standard to the state appellate court's decision, the Court can quickly dispatch the "contrary to" requirement.  *Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (a state court decision is "contrary to" clearly established law if it "applies a rule different from the governing law set forth [by the Supreme Court], or if it decides a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts").  The Court first recognizes that a state court is presumed to know and follow federal constitutional law, such as the *Strickland* standard, which has been routinely

applied in criminal cases for many years. *Burt v. Titlow*, 571 U.S. 12, 19, 134 S. Ct. 10, 187 L. Ed. 2d 348 (2013); *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002). Additionally, the AEDPA standard is a demanding requirement that is difficult for Thomas to meet because the Court must give the benefit of the doubt to the state court decision when reviewing ineffective assistance claims. *See Woods v. Donald*, --- U.S. ----, 135 S. Ct. 1372, 1376 (2015); *Cullen*, 131 S. Ct. at 1403. Here, the state appellate court decision identified the controlling *Strickland* standard and then applied it throughout its decision. This is more than sufficient to demonstrate that the state court decision was not contrary to *Strickland*. The fact that the state appellate court decision did not track the *Strickland* language verbatim is of no moment, as state courts are permitted to use "short-hand" when stating and applying legal standards. *Sussman v. Jenkins*, 636 F.3d 329, 359–60 (7th Cir. 2011); *Woods v. Schwartz*, 589 F.3d 368, 378 n.3 (7th Cir. 2009).

Thomas also cannot show that the appellate court unreasonably applied *Strickland*. Regarding the *Strickland* prong of deficient performance, Thomas' argument is that counsel was ineffective for failing to renew the motion to suppress after the guilty verdict in light of Kenneth's trial court testimony. This argument ignores the fact that Thomas' counsel took steps both at trial and in post-trial motions to renew the issue.

Trial counsel's closing arguments to the trial judge (who was sitting as the finder of fact at trial) raised the arguments that Thomas claims should have been raised through a later motion to suppress:

> But curiously enough all the people looking at the lineup in which my client was identified were all in the same room. And my recollection, and I might be wrong, the testimony was from one of the witnesses that after looking at the lineup they went back into the room and they compared notes, I think his word was compared.

> I find that very strange that witnesses were not kept separate when they were viewing a lineup.
>
> Now, your Honor has already before I represented my client denied a motion to suppress lineup identification. But again, as you look at those lineup photographs where your Honor did view, my client was wearing if you can recall a DOC uniform. It was turned inside out and you can see the letters DO. And my client is substantially, substantially larger than the others.

Doc. 22-1 at 175. Additionally, the issue was raised in both trial and post-trial counsels' motions for a new trial. Under Illinois law, a defendant preserves an issue for appeal by objecting at trial and again raising the issue in a written post-trial motion. *People v. Bush*, 827 N.E.2d 455, 463, 214 Ill. 2d 318, 292 Ill. Dec. 926 (2005); *People v. Enoch*, 522 N.E.2d 1124, 1130, 122 Ill. 2d 176, 119 Ill. Dec. 265 (1988).

The Court finds that defense counsel performed competently. Counsel brought a pre-trial motion to suppress, renewed the arguments within the context of trial (including raising the new information brought forth by Kenneth's testimony at trial in closing arguments), and then preserved the issue for appeal through the required post-trial motion. Defense counsel had no obligation to also file an additional motion to reconsider the motion to suppress. Defense counsel raised the argument before the trial court which rejected it; nothing requires defense counsel to continue raising losing arguments after preserving the arguments for appeal. *See Whitehead v. Cowan*, 263 F.3d 708, 731–32 (7th Cir. 2001) (explaining, within the context of appellate argument, that an attorney is not required to raise what she considers to be losing arguments); *Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996) ("Failure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel."). In short, there is no deficient performance, and certainly Thomas cannot show that the state court decision on his claim was unreasonable as required by the demanding AEDPA standard.

Additionally, the Court sees no prejudice to Thomas. The state appellate court concluded that Kenneth's testimony did not establish taint in the line-up identification. Yet, this is not actually Thomas' claim. Thomas is arguing that his counsel was ineffective for failing to raise a new motion to suppress after trial. As explained above, the Court cannot see how Thomas was prejudiced when his defense counsel raised the issues at trial, in the post-trial motion, and on appeal.

However, for purposes of completeness, the Court considers the taint issue. *See United States v. Cieslowski*, 410 F.3d 353, 360 (7th Cir. 2005) ("When the claim of ineffective assistance is based on counsel's failure to present a motion to suppress, we have required that a defendant prove the motion was meritorious."). *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), and *Manson v. Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977), set forth the controlling Supreme Court precedent at the time of the relevant state court decision. *See Perry v. New Hampshire*, --- U.S. ----, 132 S. Ct. 716, 724, 181 L. Ed. 2d 694 (2012). First, there is only a concern when the eyewitness identification is both "suggestive and unnecessary." *Id.* A suggestive and unnecessary identification method is not sufficient by itself to require suppression; suppression should occur only if there is a "'substantial likelihood of misidentification.'" *Id.* (quoting *Biggers*, 409 U.S. at 201). The reliability of the eyewitness identification is the "linchpin" of the evaluation. *Id.* at 724–25 (quoting *Brathwaite*, 432 U.S. at 114). The Court looks to the totality of the circumstances in determining the substantial likelihood of misidentification. *Id.* at 725. Factors that assist the Court in the analysis include: "(1) the opportunity of the witness to observe the criminal at the time of the crime (or prior to the identification); (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the time of

the identification; and (5) the length of time between the crime and the identification." *Lee v. Foster*, 750 F.3d 687, 692 (7th Cir. 2014).

Kenneth's testimony is troubling to the extent that he says that eyewitnesses were returned to same room after viewing the lineup and allowed to speak with witnesses who had not yet viewed the lineup. This suggests the possibility that the witnesses were influenced by prior witnesses when viewing the lineup. But despite the questionable identification procedure, Thomas cannot demonstrate any taint, and so he certainly cannot meet the even more demanding AEDPA standard. The trial court, within the context of finding Thomas guilty, found that the witnesses had a significant opportunity to observe Thomas during the home invasion and murders. Doc. 22-1 at 189 ("So I have four witnesses independently of each other who have identified [Thomas] under circumstances where they had an opportunity to view [Thomas]."). The trial court also found Angela and Larry to be extremely strong eyewitnesses when summarizing their testimony. It called Angela "an excellent witness," noting that Angela "looked at [Thomas] for three to four minutes, continued to look at him until he noticed she was looking at him," and was able to look at Thomas while they were "talking face-to-face." Doc. 22-1 at 181–82. The trial court also found Larry to be a "very good witness" who had the opportunity to get "a good look at the defendant's face." *Id.* at 183. The trial court thus chose to believe the prosecution's witnesses and rejected Thomas' alibi.

The totality of the circumstances as found by the trial court does not suggest the likelihood of misidentification. To the contrary, the witnesses had the ability to independently view Thomas during the home invasion. The trial court could properly rely on the prosecution's witnesses when finding Thomas guilty. There is nothing in the record to rebut these findings and the presumption of correctness accorded to them. *See Hayes v. Battaglia*, 403 F.3d 935, 938 (7th

Cir. 2005) ("[I]t is black letter law that testimony of a single eyewitness suffices for conviction even if 20 bishops testify that the eyewitness is a liar.").  Because Thomas cannot demonstrate any type of prejudice nor that his counsel's performance was deficient, his ineffective assistance of counsel argument fails.  *See Oliver v. Pfister*, No. 13 C 426, 2013 WL 3177882, at \*14 (N.D. Ill. June 20, 2013) (failure to renew motion to suppress after trial was not ineffective assistance where totality of evidence would have defeated the motion had it been made).

      **B.      Failure to Call Larry Johnson as a Witness.**

      Thomas also argues that his trial counsel was ineffective for failing to call Larry Johnson as a witness at trial.  Johnson was in the house during the home invasion, viewed the police lineup, and identified the two other offenders—McCoy and Walker—in the lineup but did not identify Thomas.  Johnson also told the police that he was confronted by two home invaders, not three.  Thomas argues that he has always claimed his innocence and presented his sister and mother as alibi witnesses at trial.  He contends that Johnson's testimony at trial would have bolstered his innocence claim.

      The police report with respect to Johnson states that:

> Larry Johnson was interviewed and he said he was asleep in the attic when he heard shots and people yelling downstairs.  Larry said he was then confronted by 2 M/B's wearing snow suits and ski masks and brandishing flashlights and handguns.  The subjects shined the lights in Larry's eyes and they ask him about the money.  The subjects force him downstairs and strike him about the head with a pistol.  When they reach the 1st floor, Larry said that other people from the house are laying on the floor and his uncle (Leon Fields) is bleeding.  Victor Wallace is laying in the bathroom and when one of the subjects asks him about the money, he replies that he did not know and is then shot.  The subjects then continue to look around the house and then leave.

Doc. 21-21 at 182.

In reviewing Thomas' claim on post-conviction review, the state appellate court found:[10]

> [Thomas's] second claim on appeal is that his trial counsel was ineffective because he did not call Larry Johnson, an eyewitness to the crimes, to testify at trial. During the discovery phase of the proceedings, defense counsel was provided with police reports that summarized statements given to the police by Larry Johnson. During the lineup, Johnson identified two other intruders who had confronted him directly, but did not identify [Thomas.] [Thomas] claims that Johnson's testimony at trial would have undermined the testimony of the other witnesses who had the same vantage point from which to see [Thomas] at the crime scene. [Thomas] claims that because Johnson was not able to identify him, Johnson's testimony at trial would have reduced the probative value of the testimony of the other eyewitnesses.

> \*          \*          \*          \*          \*

> [W]e agree with the State that the decision not to call Johnson as a witness was a matter of trial strategy and is not an arguable basis for claiming ineffective assistance of counsel. When deciding an issue of ineffective assistance of counsel, a court accords much deference to the trial court's strategic choices made after investigating the law and facts of the case. [Citation omitted]. In his opening brief before this court, [Thomas] characterizes his trial as "a credibility contest." As part of a trial strategy, defense counsel presented witnesses who claimed that [Thomas] was not present at the crime scene. The State's eyewitnesses were cross-examined and their identifications impeached by stipulated testimony of the investigating police officers.

---

[10] The State claimed before the state appellate court that Thomas forfeited the issue in his post-conviction proceedings. *See* Doc. 21-12 at 9. The state appellate court acknowledged the forfeiture argument but continued to the merits. *Id.* ("Assuming, *arguendo*, that this issue was not forfeited . . . ."). A state court decision based on an adequate and independent state law ground, such as forfeiture, results in procedural default of the underlying claim on federal habeas corpus review when the state court clearly and expressly relies upon the state law ground. *Pole v. Randolph*, 570 F.3d 922, 937 (7th Cir. 2009). Respondent has not asserted a procedural default defense, and to the extent the doctrine would apply, Respondent has forfeited the argument because it is an affirmative defense. *See Kaczmarek v. Rednour*, 627 F.3d 586, 591–92 (7th Cir. 2010); *Perruquet v. Briley*, 390 F.3d 505, 519 (7th Cir. 2004). The Court will not consider the question of procedural default further and has omitted the state appellate court's forfeiture discussion from the above excerpt.

> After reviewing the entire record, we conclude that
> [Thomas] did not allege in his postconviction petition, any
> arguable basis on which to satisfy either prong of the *Strickland*
> test, specifically: (1) that his trial counsel's performance was
> ineffective or fell below an objective standard of reasonableness;
> and (2) that he was prejudiced as a result of his trial counsel's
> failure to call Johnson as a witness at trial.

Doc. 21-12 at 8–10.

As with Thomas' first claim for ineffective assistance, the state appellate court's decision cannot be said to be "contrary to" clearly established federal law, because it identified and correctly described the proper *Strickland* standard. Nor can Thomas show that the appellate court's decision was an unreasonable application of *Strickland* because Johnson's statement to the police is actually harmful to Thomas and thus the decision not to call Johnson was sound trial strategy and did not prejudice Thomas. Thomas admitted at trial that he committed eight other home invasions between August 1995 and January 1996 with McCoy and Walker but denied committing this crime. If Johnson had testified, the trial court could have inferred that Thomas was also present even though Johnson did not see Thomas—Johnson identified McCoy and Walker in the lineup and it would be logical to conclude that Thomas was present in the home with the other members of his home invasion crew. Further, Johnson's testimony was consistent with the other eyewitnesses in that he saw the offenders in snowsuits with guns and flashlights, found other family members on the floor, saw Leon had been shot, and saw Victor get shot after he said he did not know where the money was. This additional testimony would have only corroborated the other eyewitnesses' testimony and thus have been harmful, not helpful, to Thomas.

Thomas, however, argues that the fact that Johnson did not identify him in the lineup would have been helpful, but Thomas fails to recognize that Johnson was in the attic when he

heard the gunshots and was confronted by the two home invaders, who presumably did not include Thomas. This is in contrast to Angela and Larry Fields who were in the basement and then the first floor when they viewed the intruders, or Latanya and Kenneth, who were on the first floor and testified to seeing all three intruders. Johnson said that he did come down to the first floor at some point, but it is not clear that he had a similar vantage point to see all three offenders as the other witnesses. Specifically, Angela spent several minutes in close proximity to Thomas while Thomas was searching Dexter's room for drugs. Larry Fields, while on the ground, was a few feet away from Thomas. There is nothing to suggest that Johnson had a more definitive view of the offenders.

Additionally, all of the other witnesses who testified at trial said that there were three intruders. Johnson's testimony is the outlier. But the prosecution could have explained this discrepancy because the testimony was that the offenders moved throughout the home as a team with different invaders performing different tasks. It would not be unexpected for two of the offenders to be in the attic while a third remained on the first floor, out of Johnson's sight. As Johnson's potential testimony could have been harmful to Thomas, and at the most was unhelpful, Thomas cannot establish ineffective assistance of counsel.

### C. Failure to Investigate Detective Cassidy's Alleged History of Investigative Misconduct

Thomas' final ineffective assistance of counsel claim is that trial counsel failed to properly investigate Detective Cassidy's history of investigative misconduct. If counsel had investigated, Thomas claims he would have discovered incidents in which Cassidy allegedly coerced false confessions from minors. Thomas specifically claims that counsel should have learned of two incidents of alleged misconduct.

25

The first incident came to light in *A.M. v. Butler*, No. 98 C 5625, 2002 WL 1348605 (N.D. Ill. June 19, 2002), *aff'd*, 360 F.3d 787 (7th Cir. 2004). A.M., a minor, was convicted of murdering his elderly next door neighbor. 360 F.3d at 792. Detective Cassidy was part of the investigation and his questioning of A.M. led to A.M.'s confession. *Id.* The questioning between the detectives and A.M. occurred in a police car outside A.M.'s home. *Id.* At the time, there was another suspect and A.M. was considered a possible witness, but during the course of questioning the police began considering A.M. a suspect. *Id.* They also took him to the police station and continued the questioning, with A.M. eventually confessing to the crime. *Id.* at 793. He did not receive *Miranda* warnings prior to giving his confession. *Id.* Although the state courts had not found a *Miranda* violation, the federal district court did and granted A.M.'s habeas corpus petition, a decision affirmed by the Seventh Circuit. *Id.* at 795–802. This led to a civil suit by A.M. against Cassidy, several other detectives, and the City of Chicago. *A.M. v. Cassidy*, No. 03 C 246 (N.D. Ill.). The defendants did not defend the suit and instead offered a $55,000 judgment, which A. M. accepted on October 1, 2003. No. 03 C 246, Doc. 17.

The second incident involved the murder of an eleven-year old girl, Ryan Harris. *In re Harris*, 781 N.E.2d 549, 551, 335 Ill. App. 3d 517, 269 Ill. Dec. 752 (2002). She was found sexually assaulted and murdered on the south side of Chicago in 1998. *Id.* Two boys, seven and eight, respectively, became the focus of the police investigation. *Id.* The seven-year old boy confessed to the murder and implicated the other boy. *Id.* at 552. Both boys were taken into custody and charged with first degree murder, but then the State dropped the charges less than a month later after the State received additional physical evidence related to the investigation. *Id.* The family of one of the boys sought the appointment of a special prosecutor to criminally investigate and prosecute the detectives involved, including Cassidy, for their alleged

26

misconduct in the case. *Id*. at 518–19. The motion for a special prosecutor also mentioned

allegations of other misconduct, including those raised in the A.M. case. *Id*. The state trial court

refused the family's request for a special prosecutor, and the appellate court affirmed. *Id*. at 519,

525–26.

Returning to Thomas's claim, the state appellate court found:

> [Thomas] first argues that his constitutional right to effective assistance of counsel was violated because his trial counsel failed to investigate the background of Chicago Police Detective Cassidy who was involved in conducting [Thomas'] February 1996 lineup.

> \*       \*       \*       \*       \*

> At [Thomas'] March 2004 trial, four eyewitnesses to the crimes, three of whom were under the age of 18 at the time the crimes were committed, testified that they had identified [Thomas] in the lineup. [Thomas] attached copies of newspaper articles to his postconviction petition regarding alleged misconduct on the part of Detective Cassidy in two unrelated murder investigations. The newspaper articles covered two separate civil lawsuits filed against Detective Cassidy which alleged that he had coerced the false confessions of minors in 1994 and 1998.

> [Thomas] claims that there was a duty on the part of his trial counsel to discover this evidence because the issue of identification of [Thomas] by the witnesses was critical to his conviction, since there was no confession or physical evidence linking [Thomas] to the crimes. [Thomas] argues on appeal that Detective Cassidy's misconduct was well-known and since [Thomas'] case involved young witnesses, failure by his defense counsel to discover this evidence was objectively unreasonable. [Thomas] claims he was prejudiced because if he had known of the alleged misconduct on the part of Detective Cassidy, he would have: (1) chosen a jury trial instead of a bench trial; (2) his trial counsel would have cross-examined the minor witnesses about their interrogation by Detective Cassidy; (3) his trial counsel would have called Detective Cassidy as a witness at trial; and, (4) he would not have testified because the evidence spoke for itself.

> \*       \*       \*       \*       \*

The allegations in a petition for postconviction relief, whether it is filed *pro se* or not, must support a theory that has merit based on legal principles and the record in the case. Here, [Thomas] argues that the alleged misconduct on the part of Detective Cassidy in two unrelated trials is somehow related to the facts in this case. [Thomas] further contends that if evidence regarding the alleged misconduct had been discovered by his trial counsel, there would have been a different outcome in his trial. This is a speculative leap by [Thomas].

The record discloses no evidence that the minor witnesses were coerced by Detective Cassidy to identify [Thomas] in the lineup. Further, [Thomas] did not include with his postconviction petition, any affidavits of the minor witnesses alleging coercion on the part of the detective. Detective Cassidy's alleged misconduct in newspaper articles in the unrelated cases is not similar to any alleged activity by Detective Cassidy in his interaction with [Thomas'] case or trial, and as such, would not have been admissible at trial because it was not relevant. *See People v. Hobley*, 159 Ill. 2d 272, 637 N.E.2d 992 (1994) which both parties cite in their briefs because of the supreme court's examination of admissibility of prior acts of police brutality. The supreme court states in *Hobley* that the prior allegations sought to be admitted into evidence must be similar to the allegations brought forth by the defendant at the trial in question. In this case, trial counsel cannot be said to be have been ineffective for not attempting to investigate and offer, inadmissible evidence. We conclude, therefore, that [Thomas] has not alleged sufficient facts, even when taken as true, that provide an arguable basis for establishing ineffective assistance of counsel under the first prong of *Strickland*. Therefore, this argument fails.

Doc. 21-12 at 6–8.

As previously discussed, Thomas cannot make a "contrary to" argument because the state appellate court decision properly identified and applied the *Strickland* standard. *See* Doc. 21-12 at 6 (identifying *Strickland* as test to be used for ineffective assistance claims). Regarding the "unreasonable application" standard, the state appellate court held that any evidence regarding Detective Cassidy's misconduct in other cases would have been inadmissible at Thomas' trial under *Hobley*. A state court's interpretation of state law, including those made in the prisoner's

state court case, "binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005). The Illinois Appellate Court, the last state court to rule on the issue, held that any evidence regarding Detective Cassidy's alleged misconduct in prior cases would have been inadmissible in Thomas' case under Illinois law. This Court must follow that ruling on Illinois law. Because the evidence would have been inadmissible, there is no prejudice to Thomas by trial counsel's alleged failure to pursue the issue. *See Kavanagh v. Berge*, 73 F.3d 733, 736 (7th Cir. 1996) (counsel not ineffective where evidence would have been inadmissible).

For completeness purposes, the Court notes additional reasons why Thomas' argument that his trial counsel was ineffective for failing to investigate Detective Cassidy's misconduct fails. As the state appellate court noted, there is no evidence to suggest that Detective Cassidy coerced the witnesses to identify Thomas in this case. This factual finding is given the presumption of correctness afforded to all state court findings, *Thompkins*, 698 F.3d at 983, and there is nothing in the record to rebut this finding.

Additionally, Detective Cassidy's involvement with the case appears to be limited to the February 8, 1996 lineup. As discussed above, any concerns regarding allegations of impropriety surrounding the lineup are cured by the witnesses' significant opportunity to view Thomas during the home invasion. Further, the Court must follow the state court's unrebutted findings that the witnesses had ample opportunity to observe Thomas. This makes their in-court identifications reliable and addresses any potential concerns regarding misconduct by Detective Cassidy during the lineup. Thus, the Court rejects Thomas' argument regarding ineffective assistance of counsel as to the failure to investigate Detective Cassidy.

## II. Exclusion of Expert Testimony Regarding Eyewitness Identification

Thomas' final argument is that the state court erred in prohibiting his expert witness from testifying regarding the reliability of eyewitness identification. Respondent argues that Thomas procedurally defaulted this claim and, alternatively, the Court cannot address this claim on federal habeas review. Respondent is correct that this claim is procedurally defaulted. A review of Thomas' brief to the state appellate court, Doc. 21-2 at 21–35, and his petition for leave to appeal, Doc. 21-5 at 13–18, shows that he only argued the state evidentiary issue to the state courts. But to preserve this claim as one for violation of federal due process, Thomas must have provided sufficient operative law and fact to alert the state court to its federal nature. *See Peterson v. Douma*, 751 F.3d 524, 531 (7th Cir. 2014) (petitioner defaulted constitutional due process argument by not raising it explicitly in state court or by relying on facts or case law that would have put state court on notice as to federal nature of claim); *White v. Gaetz*, 588 F.3d 1135, 1139 (7th Cir. 2009) (to determine if petitioner sufficiently alerted state courts to constitutional nature of claim, court looks to whether petitioner relied on federal or state cases applying a federal constitutional analysis, asserted the claim in terms that call to mind the constitutional right, or alleged a pattern of facts that are "within the mainstream of federal constitutional litigation"). Thomas did not do this, and so he defaulted this claim. The record does not suggest cause and prejudice, or that the failure to consider the claim will result in a fundamental miscarriage of justice. *See Johnson v. Loftus*, 518 F.3d 453, 456–57 (7th Cir. 2008). Thus, Thomas has procedurally defaulted his claim.

Respondent also argues that the Court need not consider the claim regarding the introduction of expert testimony because the state appellate court found that Thomas had forfeited the issue by failing to raise it in his post-trial motion. Forfeiture is an independent and

adequate state ground precluding habeas review. *Lee*, 750 F.3d at 693; *Smith v. McKee*, 598 F.3d 374, 383 (7th Cir. 2010). But to foreclose review on independent and adequate state grounds, "the state court must actually state in plain language that it is basing its decision on the state procedural default and that other grounds are reached only in the alternative." *Jenkins v. Nelson*, 157 F.3d 485, 491 (7th Cir. 1998). Here, the state appellate court's decision was based on both procedural and substantive grounds, but the substantive analysis was prefaced by stating that the appellate court conducted its analysis in the alternative. *Thomas*, 881 N.E.2d at 549 ("Even on the merits we would find no error in the decision of the trial judge."). Thus, the independent and adequate state ground doctrine bars review of the eyewitness expert testimony claim. *See Romero v. Battles*, 234 F.3d 1273 (Table), 2000 WL 1206691, at *3 (7th Cir. 2000) (claim procedurally defaulted where state court prefaced analysis by stating "even if we considered the merits"); *Stevenson v. Gaetz*, No. 11 C 4393, 2013 WL 1385557, at *3 (N.D. Ill. Apr. 3, 2013) (claim procedurally defaulted where state court prefaced discussion of merits by stating "assuming, arguendo, that defendant had not [forfeited the claim]" (alteration in original)).

But even if Thomas had not procedurally defaulted this claim, as a general principle, federal habeas corpus review cannot address questions regarding the admissibility of evidence in the state courts because they involve issues of state law. *Lechner v. Frank*, 341 F.3d 635, 642 (7th Cir. 2003) ("Federal habeas corpus relief does not lie for errors of state law . . . ."); *Milone v. Camp*, 22 F.3d 693, 702 (7th Cir. 1994) ("The admissibility of evidence is generally a matter of state law."). Additionally, the state court ruling is beyond federal habeas review because the federal court must follow the state court's ruling applying state law. *Bradshaw*, 546 U.S. at 76. However, an error in a state law evidentiary ruling is cognizable on habeas corpus review when

it results in fundamental unfairness so as to violate federal due process rights.  *Lechner*, 341 F.3d at 642.

The Seventh Circuit has recognized that the "awareness of the frequency of mistakes in eyewitness identifications has grown."  *United States v. Ford*, 683 F.3d 761, 766 (7th Cir. 2012) (citing to several academic studies in support of this statement); *see also United States v. Thomas*, 763 F.3d 689, 695 (7th Cir. 2014) (recognizing "mounting scientific evidence about the unreliability of eyewitness identification").  Despite these concerns, expert testimony is permitted, but not required, on eyewitness identification.  The general rule in the Seventh Circuit is that district courts do not abuse their discretion when excluding expert testimony on eyewitness identification because expert testimony invades the finder of fact's duty of evaluating the credibility of witnesses, and the risk of misidentification is a matter within the general understanding of fact finders without the help of experts.  *United States v. Carter*, 410 F.3d 942, 950 (7th Cir. 2005).  *But see Perry*, 132 S. Ct. at 729 (noting that some states allow "expert testimony on the hazards of eyewitness identification"); *United States v. Bartlett*, 567 F.3d 901, 906 (7th Cir. 2009) (expert testimony on eyewitness identifications should not be excluded just because the court believes "jurors know from their daily lives that memory is fallible," since "[e]xpert evidence can help jurors evaluate whether their beliefs about the reliability of eyewitness testimony are *correct*")

The Court notes that it is limited by the AEDPA's restrictions.  Habeas corpus relief is not available unless the state court ruling is contrary to, or an unreasonable application of, clearly established federal law from the Supreme Court of the United States established as of the time of the relevant decision.  The Court is unaware of any Supreme Court precedent in effect at the time of the state court decision instructing that federal due process requires the introduction of expert

testimony regarding eyewitness identification. As the foregoing discussion shows, there is a growing discussion over the reliability of eyewitness identification. This means the area of law is in flux and therefore there is no clearly established Supreme Court precedent on this point. Thus, even if Thomas had not procedurally defaulted this claim, the Court would find it not cognizable because it is a matter of state law and does not amount to a due process violation because there was no clearly established federal law from the Supreme Court at the time of the relevant state court decision.

## CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing § 2254 Cases, the Court must issue or deny a certificate of appealability when it enters a final order adverse to a petitioner. A habeas petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (citing 28 U.S.C. § 2253(c)(2)). To make a substantial showing, the petitioner must show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4, 103 S. Ct. 3383, 77 L. Ed. 2d 1090 (1983)). The requirement of a certificate of appealability is a threshold issue and a determination of whether one should issue neither requires nor permits full consideration of the factual and legal merits of the claims. "The question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Miller-El*, 537 U.S. at 342.

For the reasons stated above, the Court finds that there can be no showing of a substantial constitutional question for appeal, as reasonable jurists would not find this Court's rulings debatable. *See Lavin v. Rednour*, 641 F.3d 830, 832 (7th Cir. 2011) (citing *Slack*, 529 U.S. at 484–85)). Accordingly, the Court declines to issue a certificate of appealability.

**CONCLUSION**

For the foregoing reasons, the Court denies Thomas's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 and declines to issue a certificate of appealability under 28 U.S.C. § 2253(c).

Thomas is advised that this is a final decision ending his case in this Court. If Thomas wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Thomas need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. Motions for reconsideration serve a limited purpose and are only appropriate to bring to the Court's attention a manifest error of law or fact or newly discovered evidence. *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000). A motion for reconsideration "is not appropriately used to advance arguments or theories that could and should have been made before the district court rendered a judgment." *County of McHenry v. Ins. Co. of the W.*, 438 F.3d 813, 819 (7th Cir. 2006) (citation omitted) (internal quotation marks omitted); *see also Matter of Reese*, 91 F.3d 37, 39 (7th Cir. 1996) (a Rule 59(e) motion does not "enable a party to complete presenting his case after the court has ruled against him" (quoting *Frietsch v. Refco, Inc.*, 56 F.3d 825, 828 (7th Cir. 1995))).

However, if Thomas wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion

must be filed within 28 days of the entry of this judgment.  *See* Fed. R. Civ. P. 59(e).  The

time to file a motion pursuant to Rule 59(e) cannot be extended.  *See* Fed. R. Civ. P.

6(b)(2).  A timely Rule 59(e) motion suspends the deadline for filing an appeal until the

Rule 59(e) motion is ruled upon.  *See* Fed. R. App. P. 4(a)(4)(A)(iv).  Any Rule 60(b)

motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1),

(2), or (3), must be filed no more than one year after entry of the judgment or order.  *See*

Fed. R. Civ. P. 60(c)(1).  The time to file a Rule 60(b) motion cannot be extended.  *See*

Fed. R. Civ. P. 6(b)(2).  A Rule 60(b) motion suspends the deadline for filing an appeal

until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the

entry of judgment.  *See* Fed. R. App. P. 4(a)(4)(A)(vi).


Dated: February 7, 2019

_____
SARA L. ELLIS
United States District Judge